## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

REYES RAMIREZ,

        Plaintiff,

vs.                                 No.  05cv0745 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Ramirez') Motion to Reverse or Remand Administrative Agency Decision **[Doc. No. 8]**, filed October 26, 2005, and fully briefed on December 16, 2005.  On October 29, 2004, the Commissioner of Social Security issued a final decision denying Ramirez' application for disability insurance benefits and supplemental security income benefits.  Ramirez seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to reverse or remand is not well taken and will be DENIED.

## I.  Factual and Procedural Background

Ramirez, now forty six years old (D.O.B. 12/20/1959), filed his application for disability insurance benefits on March 18, 2002.  On February 12, 2002, Ramirez also filed a claim for supplemental security income.  Ramirez alleges disability since November 20, 2001, due to diabetes, hypertension, obesity, low back pain, knee pain, and asthma.  Tr. 15.  Ramirez has a

tenth grade education and past relevant work as a laborer and truck driver.  Tr. 15.  On October

29, 2004, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that

Ramirez' had been diagnosed with "diabetes mellitus, hypertension controlled on medication,

history of left knee surgery, and history of low back pain."  Tr. 15.  The ALJ found these

impairments to be severe but concluded that "[n]one of [Ramirez'] medically determinable severe

impairments m[et] or medically equal[ed] or even approach[ed], either singly or in combination, a

section in the Listing of Impairments, Appendix 1, Subpart P of the regulations."  Tr. 15.  The

ALJ further found Ramirez retained the "residual functional capacity (RFC) for a wide range of

light work with occasional kneeling and crawling and avoid intense exposure to smoke, fumes,

dust, high wind, extreme cold, and poorly ventilated spaces."  Tr. 18.   After considering all of the

evidence, the ALJ did not find Ramirez "credible with regard to his subjective statements or

complaints."  Tr. 18.   Ramirez filed a Request for Review of the decision by the Appeals Council.

On May 19, 2005, the Appeals Council denied Ramirez' request for review of the ALJ's decision.

Tr. 4-6.  Hence, the decision of the ALJ became the final decision of the Commissioner for

judicial review purposes.  Ramirez seeks judicial review of the Commissioner's final decision

pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether she applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

3

At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Ramirez makes the following arguments: (1)  the ALJ's RFC determination violates Social Security Ruling 96-8p and Social Security Ruling 96-6p and is not supported by substantial evidence because the ALJ ignored the findings of the Administration's consultative physician; (2) the ALJ's determination that Ramirez could return to his past relevant work as a truck driver fails to apply the three phase analysis required under Social Security Ruling 86-62 and relevant Tenth Circuit case law; and (3) the ALJ erred in conclusively applying the Medical-Vocational Guidelines (the grids) to support his position that Ramirez could perform other work despite his impairments.

## A.  Medical Records

On **January 11, 2002**, Karen C. Laurenzo, C.N.M., C.F.N.P., submitted a letter opining "Mr. Ramirez should be placed on lifelong disability as well as SSI."  Tr. 164.  Ms. Laurenzo reported she "had been providing care for Mr. Ramirez starting **January 11, 2002**."  Tr. 164. Specifically, Ms. Laurenzo stated:

4

This letter is being written on behalf [of] Reyes Ramirez.  I've been providing care for Mr. Ramirez starting January 11, 2002.  During his physical exam it has become apparent that due to a variety of physical disabilities, Mr. Ramirez is not capable of doing any type of work which requires sitting, standing, walking or doing repetitive motions for any period of time.  He is also unable to do work requiring lifting of more than five pounds.  Mr. Ramirez is suffering from uncontrolled diabetes, as well as uncontrolled high blood pressure.  He also suffers from severe lower back pain as well as severe bilateral knee pain.  His back pain makes it intolerable for him to stand or walk for more than very short distances for short periods of time.  He has significant decreased range of motion in his back as well as in his lower extremities.

At this time his diabetes is reaching a point of critical level, and efforts are being made to correct this as quickly as possible.  However, any increased amount of stress whether it be physical or emotional will potentially cause his blood sugar's (sic) to be out of control.  if his blood sugars continue to remain at critically high levels, hospitalization will become necessary.

Tr. 164.  Ms. Laurenzo also submitted a Medical Assessment of Ability to do Work-Related Activities (Physical).  Tr. 165.  Ms. Laurenzo indicated Ramirez could: (1) occasionally lift and/or carry less than 5 pounds; (2) frequently lift and/or carry less than 5 pounds; (3) stand and/or walk less than 2 hours in an 8-hour workday; and (4) sit less than 4 hours in an 8-hour workday.  Tr. 165.  Additionally, Ms. Laurenzo opined Ramirez was unable to use his hands for repetitive action and was limited in his ability to push, pull, or manipulate with his lower and upper extremities.  In support of her opinion, Ms. Laurenzo noted Ramirez suffered from severe knee and back pain.  Ms. Laurenzo also noted Ramirez suffered from "diabetes with fluctuations in blood sugar."  Tr. 165.

On **April 17, 2002**, Ramirez was admitted to University Hospital for pneumonia.  Tr. 138.  Dr. Sibbit performed a history and physical examination.  Tr. 140.  Ramirez presented with a history of four days of productive coughing that interfered with his sleep.  Ramirez described coughing yellow sputum and complained of fever and chills, wheezing, and shortness of breath for the previous two days.  Notably, Ramirez reported being "**normally an active man without**

5

**shortness of breath or chest pain on a regular basis.**"  Tr. 140.  Ramirez reported having chest

pain only with deep inspiration.  Dr. Sibbit's physical examination revealed the following:

> OBJECTIVE:
> Vital signs– temperature 37.3, blood pressure 125/53, pulse 109, respiratory rate 21, oxygen
> saturation 87-88% on room air which improved to 90-91% on 3 liters.  In general, the patient
> is alert and oriented x 3, **in no acute distress**, well groomed.  Head, eyes, ears, nose, throat
> exam– Pupils were equal, round and reactive to light.  Tympanic membranes– the right is
> clear.  The left is difficult to visualize secondary to cerumen blockage.  The oropharynx is
> clear with no erythema and no exudate.  Neck– supple, no lymphadenopathy.  Chest– the
> patient has expiratory wheezing in the anterior lung fields heard bilaterally.  Also has
> expiratory wheezing and coarse breath sounds in the bases bilaterally in the posterior lung
> fields.  There are no areas of dullness to percussion.  Cardiovascular examination– heart
> sounds are distant, tachycardiac, regular rhythm, no murmurs were appreciated.  JVP was
> difficult to assess secondary to patient's weight.  Abdomen– positive bowel sounds, soft,
> obese, non-tender.  Back – no CVA tenderness.  Extremities– **pulses are 2+ bilaterally in the
> lower extremities and there is no edema.**  Skin– there are no rashes seen.  Psych exam was
> appropriate.
>
> LABORATORY DATA:
> CBC with white count 11.4, hemoglobin 18.1, hematocrit 52, platelets 153, MCV 93, RDW
> 12.6, potassium 3.8, creatinine 1.0, magnesium 1.9, hemoglobin A1C is pending and blood
> culture is pending.  EKG showed sinus tachycardia and incomplete right bundle branch block.
> Chest x-ray– there is some opacity in the right hemidiaphragm.
>
> ASSESSMENT AND PLAN:
> The patient is a 42 year old male with asthma and type 2 diabetes and hypertension with new
> onset of productive cough and hypoxia.  Differential for hypoxia includes pneumonia,
> bronchitis, asthma, congestive heart failure or cardiac ischemia.  Most likely diagnosis in this
> patient is pneumonia given the productive cough and subjective fever and chills and chest x-
> ray findings.  Also given the fact that the patient has a history of asthma and also has
> wheezing on exam, there may be a component of asthma exacerbation in this patient.  Given
> the fact that he has no prior history of cardiac problems, has no lower extremity edema on
> exam and no acute changes on EKG, congestive heart failure and cardiac ishemia are less
> likely in this patient.
> 1. Antibiotics.  The patient was started on cefotaxime 1 gram IV Q8 hours and doxycycline
> 100 mg PO Q12 hours.
> 2. For the dyspnea, the patient is on 3 liters nasal cannula.  The patient will also be given an
> albuterol inhaler and will be started on an Azmacorat which is a longer acting inhaled steroid.
> 3. For diabetes the patient will be kept on his regular Glucotrol of 30 mg QAM and will also
> be given a sliding scale insulin as needed.  The patient will be on IV fluids D5 ½ normal saline
> plus 20 mEq of KCL at 125 cc per hour.
> 4. Hypertension.  Due to the fact that the medication the patient is on is unknown we will not
> start anything for that right now but will monitor blood pressure and will talk with the patient
> again tomorrow about what that medication was so that we can restart that.

Tr. 141-142.  Additionally, in his discharge notes, Dr. Sibbit noted that Ramirez' **"blood sugars were under decent control throughout his stay."**  Tr. 138.

On **April 21, 2002**, a physician noted Ramirez had not been discharged from the hospital on April 20, 2002 as originally planned due to difficulties getting home oxygen set up for him.  Tr. 137.  However, the physician noted, **"Today, the patient actually did not demonstrate an O2 requirement.  He was satting (oxygen saturation) 90-93% on room air while sitting and did not go below 89% while walking up and down the hallway.  He was not complaining of shortness of breath and lung examination was clinically improved with only fine basilar crackles bilaterally but no expiratory wheezing as was heard before."**  Tr. 137.  The physician directed Ramirez to follow-up with Ms. Laurenzo.

On **May 3, 2002,** Richard W. Sonntag, Jr., M.D., an opthalmologist, evaluated Ramirez.  Tr. 124-125.  Dr. Sonntag completed a "Vision Evaluation Form" and indicated Ramirez had 20/20 vision in both eyes and normal visual fields.  Tr. 124.  Dr. Sonntag also found Ramirez had no cataracts and no diabetic retinopathy.  Tr. 125.  Finally, Dr. Sonntag noted Ramirez was using oxygen even though Ramirez had no audible wheezing and no shortness of breath.

On **May 20, 2002**, G.T. Davis, M.D., performed a consultative evaluation on Ramirez.  Tr. 126-132.  Dr. Davis noted Ramirez' DDS documents indicated allegations of severe diabetes, high blood pressure, prostate enlargement, asthma, low back problems, pain in the left knee, weak eyes, and swelling and pain in the left ankle and left lower leg.  Tr. 126.  On the day of the consultative examination, Ramirez was using nasal oxygen at 2 liters a minute and explained to Dr. Davis that he had been treated at University of New Mexico Medical Center for "double pneumonia" and was prescribed antibiotics and directed to use oxygen at home for 3-6 months.

7

Ramirez reported he was using the oxygen continuously, was feeling better, and experienced shortness of breath only when he moved around too much.  Otherwise, he was fairly comfortable. Tr. 126.

Ramirez reported a history of an episode of pneumonia in 1997 or 1998 which was treated at Presbyterian Hospital.  Tr. 126.  During that episode, he reported developing significant swelling in his left lower extremity below the knee which culminated in an infection.  Ramirez reported his left leg had been swollen ever since and his doctors had informed him he had poor circulation.

Ramirez also reported he had been diagnosed with hypertension in 1990 and with diabetes in 1996 or 1997.   His hypertension was controlled with medications.  He diabetes was treated with oral medication but, due to financial difficulties, he stopped his medication for about two years.  Ramirez resumed the medication in February of 2002.  He reported his treating physician managed his diabetes.

Ramirez complained that for many years he had experienced constant soreness of his back. However, he did not mention that the pain radiated to his leg.  He stated he hurt his back in an accident.  Ramirez also reported having knee surgery in 1982.  He complained of pain and swelling of his knee.

Dr. Davis noted he did not have the records for Presbyterian Hospital or for University of New Mexico Medical Center.  Dr. Davis examined Ramirez, noting as follows:

> PHYSICAL EXAMINATION: Shows a gentleman who seemed to be alert and oriented.  He had an oxygen tank with him, and nasal O2 going at 2 liters a minute.  The blood pressure was 128/78, pulse 80, height 64 inches, and weight 242 pounds.  His eyes were dilated earlier today at an ophthalmological examination for Social Security.  We did not test his vision, but on funduscopic exam, I didn't see any gross hemorrhages or exudates.  Please refer to the ophthalmological evaluation for more information.  Hearing and speech were intact.  His gait

seemed to be normal. His balance was good. He could take a couple of steps on his toes and heels and would squat down about half way. With squatting there was some crepitation in the left knee. Limb measurements in the upper extremity were symmetrical, and in the lower extremity his legs seemed to be symmetrical except there were (sic) some swelling in the left leg below the knee. There was a brawny hyperpigmented discoloration of the skin of the left leg more so than on the right side. There was 1+ edema on the left, trace edema on the right shin.

He demonstrated good mobility of the neck, mid back, and low back. He was able to bend forward and touch his toes. There was no spasm or deformity, and his back and seated straight leg raising was negative.

In the upper extremities, he had good motion of the shoulders, elbows, wrists, and digits. Motor, sensory, and reflex functions were intact. Hand functions were normal.

In the lower extremities, he had good movement of the hips, knees, and ankles. There was chronic swelling in the left leg below the knee with 1+ edema and trace edema on the right. There was a healed anterior scar over the left knee. He reported pain with flexion to about 100 degrees at the left knee. There may be a slight effusion or synovial thickening of the left knee. There was no instability there. Distal pulses were intact in the feet. Vibratory sensation was intact, and deep tendon reflexes at the knee and ankles were 1+ on both sides.

The lungs were clear to A&P (auscultation and percussion) without rales, rhonchi, or wheezes. Heart exam revealed a regular rhythm. There was no appreciated gallop or murmur. Abdominal exam revealed obesity but no liver enlargement, spleen enlargement, or ascites was (sic) present.

Tr. 127-128. Dr. Davis also included a Physical Findings and Range of Motion form which was

essentially normal. Tr. 132. Dr. Davis summarized his findings and conclusion:

SUMMARY: Examinee has problems with diabetes, apparently poorly controlled, hypertension that seems to be controlled, history of edema in the left leg greater that the right, possibly due to chronic venous insufficiency, history of left knee surgery with some residual complaints there, history of low back pain, history of visual disturbances, possibly due to shifting blood sugars, recent episode of pneumonia, and now he is on oxygen apparently for 3-6 months.

At this point, given his multiple health problems, **and the need for oxygen,** it is unlikely he would be able to engage in any significant type of work activity until he is recovered. Once he gets his diabetes under control, he may be able to engage in more activities. He may have some ongoing limitations due to swelling in his leg, and perhaps some posttraumatic arthritis in his left knee. **Please correlate with any other records or documents**.

Tr. 128 (emphasis added).

9

On **June 26, 2002**, Diane J. Klepper, M.D. with the Pulmonary Division of University of New Mexico Health Sciences Center evaluated Ramirez.  Tr. 134-135.  Dr. Klepper noted Ramirez had been recently hospitalized at UNMH for treatment of a presumed right lower lobe pneumonia.  Tr. 134.  Dr. Klepper also noted Ramirez was breathing better and was complaining of shortness of breath with exertion and some bilateral leg swelling.  Tr. 134.  In a letter to Ms. Laurenzo, Dr. Klepper provided the following information:

> In reviewing the patient's hospital chart, at the time of his admission he was felt to have right lower lobe infiltrates and a small pleural effusion.  A lung scan was not done at that time, though apparently doppler studies of his legs were ordered on an out-patient basis.  He failed to appear for that study, and it has been rescheduled for 07/03/02.
>
> On physical exam, the patient's temperature was 96.8.  His pulse was 74 and regular.  His respiratory rate was 18.  His blood pressure was 125/75.  His weight was 251 pounds.  The patient's oxygen saturation was 92% on room air and it decreased to 87% after walking 200 yards.  The patient is obese.  The chest exam was clear to auscultation and percussion.  The cardiac exam revealed a regular sinus rhythm with no murmurs or gallops.  The extremity exam revealed no evidence of ankle swelling or calve tenderness.
>
> Spirometry showed a forced vital capacity of 3.24 (70% of predicted) and an FEV1 of 2.83 (74% of predicted).  This is consistent with a mild restrictive defect which may be due to the patient's obesity.
>
> Review of the patient's chest x-ray during his last admission showed a small right pleural effusion with a slightly elevated right hemidiaphragm.  No repeat x-ray was obtained.
> The patient appears to be stable at the present time.  **His oxygen is quite adequate at this time and I chose to discontinue his oxygen.**  I encouraged him to try to lose weight and to be more active.  I do not feel that his clinical history relating to obstructive sleep apnea is such that he requires a sleep study at this time.

Tr. 134-135 (emphasis added).  The June 26, 2002 spirometry was normal.  Tr. 136.

On June 14,  2002, Mark Werner, M.D., completed a Physical Residual Functional Capacity Assessment.  Tr. 153-160.  Dr. Werner opined Ramirez could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and his ability to push and/or

pull was unlimited.  Tr. 154.  On December 11, 2002, David Green, M.D. reviewed the evidence in the file and the RFC and affirmed Dr. Werner's findings.  Tr. 160.  Both physicians are nonexamining agency consultants.

On **September 5, 2003**, Ramirez completed a Brief Pain Inventory.  Tr. 161.  Ramirez reported experiencing pain on his wrists, knees, ankles, shoulders and lower back.  He rated the pain at its worst as a 10, indicating his pain was "as bad as you can imagine."  Tr. 161.  When rating his pain at its least in the last 24 hours, Ramirez rated it a 6 and on average a 7.  Ramirez also reported the pain affected him in the following areas: his general activity, his mood, walking ability, normal work, his relations with others, his sleep, his enjoyment of life, his concentration, and his appetite.  Tr. 161.

On the same day, Ramirez also completed a Depression Anxiety Stress Scale 42.  Tr. 162.  On the scale, Ramirez rated himself as mostly 2s (applies considerably) and 3s (applies very much or most of the time) on different statements applicable to him over the past week.

## B.  RFC Assessment

Residual functional capacity is defined as "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirement of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).  Ramirez contends the ALJ's RFC assessment violates Social Security Rulings 96-6p and 96-8p and is not supported by substantial evidence because the ALJ ignored Dr. Davis' findings.  Ramirez argues that the ALJ "failed to substantively address Dr. Davis' report and findings" in violation of Social Security Ruling 96-8p and ignored Dr. Davis' opinion even though he is considered an expert under Social Security

Ruling 96-6p.  Additionally, Ramirez argues "other evidence in the record supported Dr. Davis'
assessment of [Ramirez'] inability to engage in any work activity."  The Court disagrees.

First, Dr. Davis' physical examination was essentially normal.  Specifically, Dr. Davis'
examination indicated Ramirez had a normal blood pressure, a normal funduscopic examination, a
normal gait, a normal lung and heart examination, good mobility of the neck, mid back and low
back, shoulders, elbows, wrists, digits, and good mobility of the hips, knees, and ankles.  Ramirez
could bend forward and touch his toes and had no spasms or deformity of the back.  The straight
leg raising test was negative.  Other than noting that there "may be a slight effusion or synovial
thickening of the left knee," Dr. Davis found "no instability" of the knees.  Tr. 127.

Dr. Davis also made clear that he did not "have Presbyterian or UNMH records available."
Tr. 128.  Thus, Dr. Davis noted, "**At this point**, given his multiple health problems, and the **need
for oxygen**, it is unlikely he would be able to engage in any significant type of work activity **until
he is recovered**."  Tr. 128.  Dr. Davis also conditioned his opinion by noting, "**Please correlate
with any other records or documents**."  Tr. 128.

The ALJ did just that.  As Ramirez points out, "the findings of Dr. Davis were linked to
other evidence in the record."  Mem. in Support of Mot. to Reverse or Remand at 5; *see also* Tr.
16 (Citing to Social Security Rulings 96-2p and 96-6p the ALJ stated: "I must also consider any
medical opinions, which are statements from acceptable medical sources, which reflect judgments
about the nature and severity of the impairments and resulting limitations.").  The ALJ found:

> The claimant has been treated for borderline diabetes mellitus, hypertension, obesity, low back
> pain, knee pain, and asthma.  A consultative examiner diagnosed diabetes mellitus,
> hypertension controlled on medication, history of left knee surgery, and history of low back
> pain.  I find the foregoing to be severe impairments as defined by the Regulations.

As to the severity of the impairments, the claimant testified that he takes only over-the-counter Tylenol for his knee pain (Ex. 11E). Dr. D. Klepper noted that the claimant had failed to keep his appointment for Doppler studies of his legs. According to Dr. Klepper, he was to be seen for his alleged leg problems in July 2002. The claimant offered no explanation for his failure to undergo this examination or testing (Ex. 3F). This raises serious questions regarding the claimant's credibility.

The claimant appeared at the hearing using a cane. At the hearing, the claimant testified that he had to quit working due to back pain. According to the claimant, he becomes "completely worn out" after he walks 150 feet to his parents' house. He added that he uses his daughter's wheelchair at times.

The claimant's testimony regarding his back and knees in not supported by the underlying medical record. There is no objective evidence that he was ever prescribed a cane or instructed to use a wheelchair.

In May 2002, Dr. R. Sontag, an ophthalmologist, conducted an eye examination and found that the claimant had no diabetic retinopathy. The claimant was found to have presbyopia. However, Dr. Sontag did not report that this medical condition caused any significant limitations of function (Ex. 1F).

The claimant was diagnosed with hypertension in April 2002 (Ex. 3F). There is no evidence of any end organ damage. In May 2002, Dr. Davis reported that the claimant's hypertension seemed to be under control (Ex. 2F). Subsequently, Dr. Klepper found that he had a normal blood pressure reading (Ex. 3F). Thus, I find that the claimant did not meet his burden of proving that he has "severe" hypertension.

In June 2002, the claimant was seen for follow up of acute pneumonia. The claimant denied daytime hypersomnolence, but Dr. Klepper instructed the claimant to undergo a sleep study to determine if he has obstructive sleep apnea. The claimant failed to follow Dr. Klepper's medical advice, and he did not provide a good reason for his failure to do so (Ex. 3F). I, therefore, find that the claimant does not have "severe" sleep apnea in this case.

None of claimant's medically determinable severe impairments meet or medically equal or even approach, either singly or in combination, a section in the Listing of Impairments, Appendix 1, Subpart P, of the Regulations. In making this finding, I have considered sections 1.03, 1.04, 3.00 and 9.08 of the listed impairments. His able counsel has not argued that the claimant approaches listing level.

**         ** ** ** ** ** ** ** ** ** **

The record evidence indicates that the claimant was found to have acute pneumonia in April 2002. This diagnosis was based on positive chest x-ray findings (Ex. 3F). However, during that same month, Dr. W. Sibitt, a rheumotologist at "UNM," examined the claimant. The claimant told Dr. Sibitt that the had shortness of breath for only two days prior to this examination. Dr. Sibitt also stated that the claimant was normally an "active" man without shortness of breath or chest pain on a regular basis. The claimant was not using any oxygen during this appointment. Dr. Sibitt ordered chest x-rays which showed only minor

abnormalities.  Dr. Sibitt diagnosed the claimant with asthma and Type II diabetes mellitus with a "new onset" of a productive cough.  Dr. Sibitt prescribed an Albuterol inhaler for his asthma.  Dr. Sibitt did not prescribe or recommend oxygen for the claimant's asthma (Ex. 3F and 3F (sic)).

The claimant was hospitalized on April 17, 2002 for four days because of pneumonia.  He was on home oxygen for his pneumonia.  Dr. Sibitt reported that the claimant's asthma responded to bronchodilators.  Dr. Sibitt reported that the claimant's primary physician would have to follow up with asthma (Ex. 3F).  As noted herein, Dr. Sontag examined the claimant in May 2002.  At that time, he reported that the claimant had no audible wheezing or shortness of breath (Ex. 1F).

**  **  **  **  **  **  **  **  **  **

In June 2002, Dr. Klepper examined the claimant at a pulmonary clinic.  The claimant complained of a history of asthma and diabetes mellitus.  He admitted that he was breathing "better," and he denied having any cough, wheezing or sputum production.  However, he did tell Dr. Klepper that he had some shortness of breath upon admission to the hospital. Although the claimant reported that he did snore, he admitted that he did not have daytime hypersomnolence.  (Ex. 3F).

Dr. Klepper's clinical examination showed that the claimant had a  normal pulse, respiratory rate and blood pressure.  She also stated that the claimant's oxygen saturation was normal overall.  The chest exam was clear to auscultation and percussion.  The cardiac examination revealed a regular sinus rhythm with no murmurs or gallops.  Furthermore, there was no evidence of ankle swelling or calf tenderness.  Dr. Klepper had reviewed the claimant's previous chest x-ray conducted in April 2002, and she found no significant findings at that time.  She also stated that the claimant had a "mild" restrictive defect which could be related to the claimant's obesity.  She instructed the claimant to quit using oxygen as his own oxygen level were "quite adequate."  Dr. Klepper instructed the claimant to lose weight and become more active (Ex. 3F).

Subsequently, as of December 2002, a state agency doctor had reviewed the medical record. This doctor reported that the claimant could perform a full range of medium work as defined in the Regulations.  "Medium work" requires prolonged standing and/or walking and lifting and/or carrying up to 50 pounds.  This doctor emphasized the fact that the claimant had a normal clinical examination at "UNM's" pulmonary clinic.  In fact, this doctor also noted that the claimant had been told to discontinue the use of any oxygen (Ex. 4F).

At the hearing held in August 2004, the claimant testified that he has been using oxygen since January 2001, and he uses it for 24 hours per day.  There is no support in the medical record for his self-prescription of oxygen.  In addition, the claimant testified at this hearing that he cannot sit too long.  He stated that he purchased a cane approximately two months prior to this hearing.  This testimony has been discredited.  None of the doctors reported that the claimant has such "severe" back or leg impairments, and I do not find that this testimony is credible.

Tr. 15-17.  Thus, the ALJ did not ignore Dr. Davis' report or his opinion.  The ALJ considered Dr. Davis' opinion as it correlated to the other medical evidence to reach his decision.  Substantial evidence supports the ALJ's RFC determination.

Prior to Dr. Davis' **May 20, 2002** consultative evaluation, Ramirez' University Hospital records indicate that on **April 17, 2002**, Ramirez reported being "**normally an active man without shortness of breath or chest pain on a regular basis**."  Tr. 140.  The ALJ also had before him Dr. Sibbet's **April 17, 2002** physical examination and his discharge notes.  Dr. Sibbet found no problems with Ramirez' extremities or back and noted Ramirez' "**blood sugars were under decent control throughout his stay**."  Tr. 138.  The records also indicate that on **April 21, 2002**, a physician had noted: "**Today, the patient actually did not demonstrate an O2 requirement**."  On that day, the physician also noted Ramirez "**was not complaining of shortness of breath and lung examination was clinically improved with only fine basilar crackles bilaterally but no expiratory wheezing as was heard before**."  On **May 3, 2002,** Dr. Sonntag evaluated Ramirez and found no cataracts or diabetic retinopathy.  Tr. 125.

The ALJ also reviewed the records after Dr. Davis' **May 20, 2002** consultative evaluation.  The ALJ cited extensively to Dr. Keppler's **June 26, 2002** evaluation.  The record indicates Dr. Keppler found Ramirez was breathing better and his oxygen saturation was 92% on room air.  Tr. 134.  The chest and heart examination were normal.  Dr. Keppler noted the "extremity exam revealed no evidence of ankle swelling or calve tenderness."  Tr. 135.  The Spirometry was consistent "with a **mild** restrictive defect which may be due to the patient's obesity."  Tr. 135.  Moreover, as the ALJ noted in his Decision, Dr. Keppler found Ramirez' "oxygen [was] quite

15

adequate at this time" and discontinued it. Tr. 17, 135.  Dr. Keppler directed Ramirez to lose

weight and become more active.  Tr. 135.

Second, Ramirez contends "other evidence in the record supported Dr. Davis' assessment

of the claimant's inability to engage in any work activity."   Ramirez contends his <u>treating</u>

healthcare provider, Ms. Laurenzo, also found he was disabled.

Generally, the ALJ must "give controlling weight to a treating physician's well-supported

opinion, so long as it is not inconsistent with other substantial evidence in the record."  *Drapeau*

*v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).  Even if a treating physician's opinion is not

entitled to controlling weight, "[t]reating source medical opinions are still entitled to deference

and must be weighed using all of the factors  provided in [§] 404.1527."  *Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003)(quoting Social Security Ruling 96-2p, 1996 WL 374188, at

*4).  A treating physician's opinion is considered in relation to factors such as its <u>consistency with</u>

<u>other evidence, the length and nature of the treatment relationship</u>, the <u>frequency of examination,</u>

<u>and the extent to which the opinion is supported by objective medical evidence</u>.  20 C.F.R. §

404.1527(d) (1)-(6)(emphasis added).  If the physician's opinion is "brief, conclusory and

unsupported by medical evidence," that opinion may be rejected.  *Bernal v. Bowen*, 851 F.2d 297,

301 (10th Cir. 1988).  Moreover, a treating physician's opinion that a claimant is totally disabled

is not dispositive "because final responsibility for determining the ultimate issue of disability is

reserved to the [Commissioner]."  *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d

1027, 1029 (10th Cir. 1994).

In this case, Ms. Laurenzo cannot be considered a treating source since she readily

admitted in her January 11, 2001 statement of disability that January 11th was her first contact

with Mr. Ramirez.  Tr. 164 ("I've been providing care for Mr. Ramirez starting January 11, 2001.").  Even if Ms. Laurenzo is considered a treating source, her opinion of disability is not entitled to much weight based on a one time visit.  *See* 20 C.F.R. §404.1527(d)(2)(i)("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight [the Agency] will give to the source's medical opinion.").  Moreover,  the ALJ disregarded Ms. Laurenzo's opinion because she was "not an 'acceptable medical source' for purposes of diagnoses and there was "no evidence [she] discussed the claimant's medical needs with a doctor or another trained medical profession."  Tr. 17; *see* 20 C.F.R. §§ 404.1513(d) and 416.913(d).  Most importantly, the ALJ disregarded her opinion because "many of Ms. Laurenzo's statements" "were not substantiated by any medical evidence."  *Id.*  Substantial evidence supports this finding.  Ms. Laurenzo's statement of disability is conclusory and not supported by the evidence.

Finally, Ramirez contends the ALJ failed to investigate what "ongoing limitations" he would have if he were able to gain control of his diabetes.  Citing to 20 C.F.R. 404.1512(e)(1), Ramirez contends the regulations require the ALJ to recontact a medical source when the report "contains a conflict or ambiguity that must be resolved."  Mem. in Support of Mot. to Reverse or Remand at 5.

Section 404.1512(e) states in pertinent part: "When the evidence we receive from your treating physician . . . other medical source is inadequate for [the Agency] to determine whether you are disabled, we will need additional information to reach a determination or a decision." Therefore, "it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the 'evidence' the ALJ receives from the

claimant's treating physician that triggers the duty." *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).  In this case, the ALJ believed the information he received was adequate to reach a decision.  The record indicates Ramirez' diabetes was under control so long as he took his medicine.  Tr. 138.  Accordingly, there was no "conflict or ambiguity" regarding Ramirez' diabetes.

## C.  Step Four of the Sequential Evaluation Process

Ramirez also argues that the ALJ failed to apply the three phase analysis required under Social Security Ruling 82-62 and *Winfrey v. Chater*, 92 F.3d 1017 (10th Cir. 1996).  Social Security Ruling 82-62 addresses the policy and explains the procedures for determining a disability claimant's capacity to do past relevant work.  SSR 82-62, 1982 WL 31386,  *1 (1982).

A step-four analysis is comprised of three phases.  In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity, and in the second phase, he must determine the physical and mental demands of the claimant's past work.  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  *Winfrey v. Chater*, 92 F.3d at 1023 (citations omitted).

Ramirez contends the ALJ erred in his RFC determination when he failed to evaluate Dr. Davis' opinion.  The failure to do so, according to Ramirez, "was a failure 'to assess the nature and extent of [his] limitations' under *Winfrey* and under Social Security Ruling 82-62."  Mem. in Support of Mot. to Reverse or Remand at 7 (quoting *Winfrey*, 92 F.3d at 1022).  The Court already rejected Ramirez' argument that the ALJ failed to evaluate Dr. Davis' opinion.  Accordingly, this argument has no merit.

Next, Ramirez contends "the second phase of the step four evaluation requires an assessment of the mental demands of the claimant's past relevant job as a seasonal truck driver." Mem. in Support of Mot. to Reverse or Remand at 7.  However, as the ALJ found there was "no evidence that [Ramirez] was ever diagnosed with depression or anxiety by a medically acceptable source."  Tr. 15.  Hence, because the ALJ did not find Ramirez suffered from a mental impairment, the ALJ did not have to "obtain a precise description of the particular job duties which are likely to produce tension and anxiety to determine if the claimant's mental impairment is compatible with the performance of such work."  Mem. in Support of Mot. to Reverse or Remand at 7 (quoting *Winfrey,* 92 F.3d at 1023).

Ramirez also contends the ALJ's decision made no assessment of any of the work demands that may have been impacted by the claimant's limitations.  *Id.*  Ramirez claims his job as a seasonal truck driver required that he sit for 7 hours in a 10 hour workday.  However, Dr. Mark Werner, the Agency's nonexamining consultant, opined he could sit "about 6 hours in an 8-hour workday."  Tr. 154.  Ramirez contends the "ALJ's lack of analysis at this second phase is clear error" and thus the Court must remand the case.  Mem. in Support of Mot. to Reverse or Remand at 8.  In addition, Ramirez claims "the ALJ's decision also lacks the requisite analysis necessary to meet the third criterion of *Winfrey*, pertaining to the claimant's ability to return to the past relevant occupation."  *Id.*  According to Ramirez, the ALJ had to make a "determination that [he] could hold the job for a significant period of time."  *Id.* (quoting *Winfrey*, 92 F.3d at 1024).

The ALJ made the following findings:

> After considering all of the evidence, <u>I do not find that the claimant's report is credible with regard to his subjective statements or complaints.</u>

19

Pursuant to prevailing Tenth Circuit caselaw, sections 404.1529 and 416.929 of the Regulations, and Social Security Ruling 96-7p, I find that the claimant retains a residual functional capacity for a wide range of light work with occasional kneeling and crawling and avoid intense exposure to smoke, fumes, dust, high wind, extreme cold, and poorly ventilated spaces.

Based upon the claimant's residual functional capacity, I must determine whether the claimant can perform any of his past relevant work. The phrase, "past relevant work" is defined in the Regulations at 20 C.F.R. §404.1565 and 416.965. The work usually must have been performed within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and meet the definition of substantial gainful activity.

The claimant's past relevant work as a truck driver was sedentary as he performed it. He could therefore perform his past relevant work as a truck driver because it is within his residual functional capacity. The would normally end my inquiry with a conclusion of "not disabled." However, because of the nature of his truck driving work, as a seasonal job, I will proceed with the step five analysis, which also lead me to a conclusion of "not disabled."

At step five, the burden of proof shifts to the Social Security Administration to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform. The claimant's age, education, and vocationally relevant past work experience, if any, must be reviewed in conjunction with the Medical-Vocational Guidelines of Appendix 2 of Subpart P of the Regulations, which contain a series of rules that may direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's residual functional capacity and vocational profile. The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has any significant nonexertional limitations.

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted my be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.

Because the claimant has the exertional capacity to perform substantially all of the requirements of light work, and considering the claimant's age, education, and work experience, a finding of "not disabled" is supported by application of Medical-Vocational Rule 202.17. I find that there are jobs, existing in significant numbers in the national economy, which the claimant is able to perform. For all the foregoing reasons, I further find that the claimant retains the capacity to adjust to work that exists in significant numbers in the national economy.

Accordingly, I conclude that the claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

Tr. 18-19 (emphasis added).   The ALJ's analysis comports with *Winfrey*. The ALJ found

Ramirez not credible as to his allegations that he could not return to his previous work due to his

severe impairments.  Ramirez does not challenge this finding.  The ALJ evaluated Ramirez'

physical and mental residual functional capacity, finding no mental impairment and an RFC for a

wide range of light work.  He then determined the physical demands of Ramirez' past relevant

work, finding the job of truck driver was sedentary as Ramirez performed it.

Ramirez' claim that the ALJ erred in his RFC determination because his job as a seasonal

truck driver required that he sit for 7 hours in a 10 hour workday when Dr. Werner opined he

could only sit about 6 hours in an 8-hour workday has no merit.   Ramirez bears the burden of

proving his inability to return to his particular former job and to his former occupation as that

occupation is generally performed throughout the national economy.  *See Andrade v. Secretary of*

*Health and Human Servs.*, 985 F.2d 1045, 1051-52 (10th Cir. 1993).  Ramirez offers no evidence

to support his claim that he could not return to his particular former job as it is generally

performed throughout the national economy.  Nonetheless, recognizing that the job was seasonal,

the ALJ proceeded to step five of the sequential evaluation process to find Ramirez was not

disabled.

## D.  The Medical-Vocational Guidelines (the grids)

Although Ramirez contends the ALJ erred in conclusively applying the grids at step five,

the Court disagrees.

The grids represent the Commissioner's administrative notice of the jobs that exist in the

national economy at the various functional levels (i.e. sedentary, light, medium, heavy, and very

heavy).  *See Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir. 1984).  If the ALJ's findings of fact regarding a particular individual's age, education, training, and RFC all coincide with the criteria of a particular rule on these grids, the Commissioner may conclude that jobs suitable for the claimant exist in the national economy and that the claimant therefore is not disabled.  *Id.*

Because the grids classify RFC based only on exertional or physical strength limitations, they may not be fully applicable to claimants with nonexertional impairments.  See 20 C.F.R. 404.1567; *Channel,* 747 F.2d at 580-81.  Nonexertional impairments are medically determinable impairments, including pain, that do not directly limit physical exertion, but may reduce an individual's ability to perform gainful work nonetheless.  *Id.* at 580.  If nonexertional impairments narrow the range of possible work the claimant can perform, the Commissioner may only use the grids as a "framework" for determining whether, in light of all claimant's impairments, he has meaningful employment opportunity within the national economy.  20 C.F.R. pt. 404, subpt. P, App.2, 200 (e) (2).  In such cases, the Commissioner must also produce a vocational expert to testify whether specific jobs appropriate to claimant's limitations exist in the national economy. *Channel*, 747 F.2d at 581.

However, although a vocational expert should be consulted when a "claimant's residual functional capacity is diminished by both exertional and nonexertional impairments," *Hargis v. Sullivan*, 945 F.2d 1482, 1491 (10th Cir. 1991), this requirement applies <u>only</u> when the exertional and nonexertional impairments limit the claimant's ability to perform the full range of work within a particular exertional category, *id.* at 1490, 1492 (emphasis added).  When an ALJ finds, based on substantial evidence, that a claimant's nonexertional impairments do not limit the range of jobs

available to her, the grids may be applied conclusively.  *See, e.g., Glass v. Shalala*, 43 F.3d 1392,

1396 (10th Cir. 1994).

In this case, the ALJ found "[t]he claimant's capacity for light work is substantially intact

and has not been significantly compromised by any nonexertional limitations."  Tr. 20.  Substantial

evidence supports this finding.  Accordingly, the ALJ did not err in applying the grids

conclusively.  Although Ramirez claims he suffered from severe knee and back pain, the record

does not support his claim.  *See*  Tr. 86 (statement by Ramirez: "Dr. Laurenzo gives me or tells

me to take Tylenol for the pain in my lower back, knees, legs, & and ankels (sic) and get a lot of

rest."); Tr. 131 (under "Current Medications" there was no mention of any type of pain

medication); Tr. 135 (extremity exam revealed no evidence of ankle swelling or calve tenderness);

Tr. 127 (demonstrated good mobility of the neck, mid back, and low back, able to bend forward

and touch toes, no spasm or deformity, back and seated straight leg raising was negative; Tr. 141

(back no CVA tenderness; extremities– pulses are 2+ bilaterally in the lower extremities and there

is no edema).

 **E.  Conclusion**

The Court's role is to review the record to ensure that the ALJ's decision is supported by substantial evidence and that the law has been properly applied.  After such review, the Court is satisfied that substantial evidence supports the ALJ's RFC determination and his finding of nondisability.  Accordingly, the ALJ's decision is affirmed.

A judgment in accordance with this Memorandum Opinion will be entered.


_____

**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**